DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a judgment of conviction and sentence entered by the Lucas County Court of Common Pleas after a jury found defendant-appellant, Chad Beach, guilty of aggravated murder. From that judgment, appellant now raises the following assignments of error:
 {¶ 2} "Assignment of Error Number One
 {¶ 3} "The trial court erred to the prejudice of Mr. Beach by denying his motion to exclude statements of the defendant made in the course of negotiating a plea agreements [sic] in violation of Evid.R. 410 and in violation of his due process rights guaranteed under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.
 {¶ 4} "Assignment of Error Number Two
 {¶ 5} "Assuming, arguendo, that the statements of Mr. Beach to law enforcement officers were not within the purview of Evid.R. 410, counsel was ineffective in not ensuring that the rules' protections were afforded to appellant, in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and the applicable portions of the Ohio Constitution.
 {¶ 6} "Assignment of Error Number Three
 {¶ 7} "The trial court erred and denied Mr. Beach due process of law by permitting the state to argue at trial that he was a complicitor after previously taking the position that he was the principal offender, in violation of his rights under the Fifth,Sixth, and Fourteenth Amendments to the Untied [sic] Constitution and the applicable portions of the Ohio Constitution.
 {¶ 8} "Assignment of Error Number Four
 {¶ 9} "The trial court improperly amended the indictment by permitting the state to argue that Mr. Beach acted as a complicitor in violation of his due process rights guaranteed under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and the Ohio Constitution.
 {¶ 10} "Assignment of Error No. Five
 {¶ 11} "The inconsistent verdicts violated Mr. Beach's rights to due process and to be free from cruel and unusual punishment as protected by the constitutions of the United States and of the state of Ohio.
 {¶ 12} "Assignment of Error Number Six
 {¶ 13} "Insofar as any of the errors complained of herein are deemed not to have been preserved properly by trial counsel, appellant was denied the effective assistance of counsel to which he is constitutionally entitled.
 {¶ 14} "Assignment of Error Number Seven
 {¶ 15} "Prosecutorial misconduct during the closing argument of the state deprived Mr. Beach of his right to a fair trial and reliable adjudication and the trial court erred in denying the defense motion for a mistrial in violation of his due process rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and the applicable portions of the Ohio Constitution.
 {¶ 16} "Assignment of Error Number Eight
 {¶ 17} "The trial court erred to the prejudice of Mr. Beach by denying the motion for acquittal presented by the defense at the conclusion of the presentation of evidence.
 {¶ 18} "Assignment of Error Number Nine
 {¶ 19} "Even if the assigned errors viewed individually are determined to be harmless, their cumulative effect can be prejudicial."
 {¶ 20} On September 13, 2001, appellant was indicted and charged with one count of aggravated murder, in violation of R.C.2903.01(B), with the specification that he had a firearm on or about his person or under his control while committing the offense, and displayed, brandished, indicated his possession of or used said firearm to facilitate the offense. The indictment was filed following the death of Joshua Buck, whose body was discovered in a manhole in a wooded area behind Bowsher High School in Toledo, Ohio on December 26, 1999. Over approximately the next month, appellant spoke to police officers investigating the case four times, each time making statements that increasingly showed his involvement in the events surrounding the murder. On January 18 and 24, 2000, appellant made statements to Sergeant Steve Forrester and Detective James Scott with his attorney Paul Accettola present. Appellant was not under arrest and made the statements voluntarily. Thereafter, believing that appellant had not been entirely forthcoming in his statement to the officers, Accettola arranged the January 24 interview but asked Lucas County Assistant Prosecutor Weglian for assurances that appellant could have a deal. Weglian indicated that if appellant was truthful and passed a polygraph exam, then he would be in a position to recommend that appellant could plead guilty to a theft offense. That polygraph exam, which was administered on January 25, 2000, resulted in an "inconclusive with probable deception" reading. Thereafter, the state indicated that the most it would be willing to offer appellant in terms of a plea bargain was involuntary manslaughter.
 {¶ 21} On December 17, 2001, appellant filed a motion to enforce plea agreement and a motion to determine the inadmissibility of statements pursuant to Evid.R. 410. Regarding the alleged plea agreement, appellant sought to enforce an agreement to allow him to plead guilty to a theft offense. The lower court held a hearing and denied the motions, concluding that neither of the interviews of January 18 or 24 were induced by a plea agreement. Thereafter, the case proceeded to trial.
 {¶ 22} The circumstances surrounding Buck's death, the discovery of his body and the police investigation into his death were testified to at the trial below as follows.
 {¶ 23} On December 25, 1999, Jill Wainwright and her daughter Julie were walking their dog in the vicinity of Bowsher High School, at approximately 2:00 in the afternoon. As they walked along a railroad track, Julie found a blue pager lying on the ground. At the same time, Jill's dog pulled in one direction and Jill noticed a pool of blood on the ground along with other spots and a trail of blood leading into the woods. The Wainwrights went back home and called the police. Subsequently, Wainwright's husband, Richard, went back out to the railroad tracks and discovered a bloody shirt. The Wainwrights again called the police, who arrived approximately ten minutes later. A search of the woods behind Bowsher High School revealed Joshua Buck's driver's license, $22 in small bills scattered about, and a bloody path that stopped and started in different places for approximately 100 yards. A canine unit was brought in to search the woods but was unable to find a crime victim or the source of the blood.
 {¶ 24} The following day, Joshua Buck's family members returned to the woods behind Bowsher High School and, after searching, discovered Buck's body in a manhole deep in the woods. Traces of blood were discovered along the path from the railroad tracks to the manhole as well as areas in which it appeared that something had been dragged. The drag marks, however, were not continuous. Detective Chad Culpert, an officer with the Toledo Police Department's Scientific Investigation Unit and the first officer to enter the manhole, testified that the manhole smelled like gasoline and that Buck's body was partially obscured by sticks and debris that had been piled on top of him. Buck's body was then removed from the manhole. Dr. Cynthia Beisser, a deputy coroner with Lucas County, testified that Buck died from a single gunshot wound to the back of the head and that the gun was approximately six to eight inches from Buck's head at the time of the assault. Dr. Beisser also testified that Buck's back was covered with multiple scratches. Given the color of the scratches, Dr. Beisser testified that Buck was alive but in the process of dying when most of the scratches were inflicted and that some of the scratches were inflicted after he had died. She further stated that the scratches were consistent with Buck having been dragged. Given the outside temperatures, however, Dr. Beisser testified that she could not estimate the time of Buck's death.
 {¶ 25} An investigation revealed that appellant, Buck and Scott McDonald were involved in drug trafficking. John Geach, a close friend of Buck, testified that during 1999, he hung out with Buck and they used drugs together on almost a daily basis. Geach stated that Buck sold 10 to 20 pounds of marijuana per week, about one-half of a kilogram of cocaine per month and that Buck obtained his drugs from appellant. Geach further stated that Buck had a lot of money which he kept in safes at Buck's father's house, Geach's apartment and Scott McDonald's house, and that Buck often kept drugs at Geach's apartment. Geach testified that on December 23, 1999, he and several other people including Buck were at his apartment when he became aware of a drug transaction that was to occur the next day. Geach's understanding of the transaction was that Buck was to buy 150 pounds of marijuana and one kilogram of cocaine from appellant. To his knowledge, no one else was to be involved in the transaction. At approximately 4:00 p.m. on Christmas Eve, Geach left his apartment to go to work. At that time, the transaction had not yet taken place and Buck remained in Geach's apartment. Geach got off of work at 8:00 p.m., and talked to Buck, who was on his way home. During the evening, Geach talked to Buck approximately three times, and each time Buck indicated that the deal had not yet occurred. Geach last talked to Buck between 10:30 and 11:00 p.m. He awoke on Christmas Day at around 10:00 a.m., and spent the day with his fiancée and family. At around 6:30 that evening, Geach received a phone call from a friend of Buck who notified him that Buck's pager and driver's license had been found. Geach then went out looking for Buck. During his search, he went to what he believed was Scott McDonald's house, but appellant answered the door. Evidently, appellant rented the house from McDonald's parents. At that time, appellant's wife Michelle and friend Chris Henneman were also at the house. Geach notified appellant that Buck was missing and asked him if the drug transaction had taken place. Appellant responded that the transaction had not taken place and that he had not seen Buck. Geach testified that when he told appellant that Buck's pager and driver's license and been found and that blood was in the vicinity, appellant seemed concerned. The following day, Geach learned of Buck's death and went back to appellant's home. At that time, appellant handed Geach $5,000, which he said was a deposit Buck had given him. Geach then took the money to Buck's father who was upset that there was not more money.
 {¶ 26} Detective James Scott of the Toledo Police Department, was involved in the investigation of Buck's death and testified at the trial below. On January 19, 2000, Scott learned through appellant's attorney, Paul Accettola, that there was a lime green Michigan baseball cap in Cincinnati that might be of evidentiary value. He subsequently recovered the cap from appellant's mother-in-law. Forensic testing on the hat, as well as the shirt found along the railroad tracks and a rock found in the vicinity of the manhole, revealed Buck's DNA. On January 19, 2000, officers of the Toledo Police Department also learned from appellant, through Attorney Accettola, the location of Buck's Jeep. The officers recovered the automobile and discovered the interior splattered with a significant amount of blood. In particular, blood was smeared on the driver's seat, the driver's side of the front passenger compartment and back seat passenger compartment behind the driver's seat. The Jeep also contained a blood soaked black leather jacket and a Colt .38 caliber revolver. The gun contained four live rounds and two empty chambers. Subsequent ballistics tests revealed that the bullet recovered from Buck was consistent with having been fired from the Colt revolver recovered from the Jeep.
 {¶ 27} In the course of the investigation, appellant was interviewed several times. Initially, on December 27, 1999, Sergeant Steve Forrester and Detective Scott went to appellant's home to interview him. Appellant's wife Michelle was also present. During that initial interview, appellant told the officers that he was in Cincinnati visiting his wife's family on December 24 and 25 and that the $5,000 that he gave to Geach was a loan from Buck. Appellant then changed his story and said that he had been holding the money for Buck because Buck liked to spread his money around. Several days later, on January 3, 2000, Sergeant Forrester and Detective Scott again interviewed appellant after they asked him to voluntarily come to the station. Sergeant Forrester described that meeting as a noncustodial, nonconfrontational interview in which the officers were simply seeking more information about the critical time periods. During that interview, appellant changed his story and revealed that he was in Toledo on December 24, 1999, that he was in church until 6:00 p.m., that he went somewhere afterward, that he got home around 10:00 p.m., that he then went to Chris Henneman's house, that he stayed there until 1:30 a.m. on Christmas Day, and that he then returned home.
 {¶ 28} On January 18, 2000, Sergeant Forrester and Detective Scott interviewed appellant for a third time. Approximately one hour after Scott McDonald was arrested, appellant telephoned the officers and indicated he had information. At this interview, appellant's attorney, Paul Accettola, was present. Again appellant changed his story. Appellant revealed that in early December he and Buck entered into an agreement for Buck to buy approximately 100 pounds of marijuana from him. Buck was to put down $33,000 for the marijuana and would pay appellant the remainder due in two weeks. Appellant was going to get the marijuana from his connection in Chicago. Right before Christmas, however, it was unclear if appellant would be able to get the marijuana. The two then agreed that Buck would give appellant $5,000 as a deposit to secure the marijuana if it came in. Appellant told the officers that on December 23, 1999, Buck gave him $5,000 and kept the remaining $28,000. On Christmas Eve, however, appellant delivered to Brad Chester $13,000 in cash as his investment in a pizza franchise. Appellant told the officers at the January 18 interview that he had already had that money and that he gave it to Chester on Christmas Eve, because Chester had told him he had found a location for the pizza franchise and needed to act on it. Appellant further revealed in that interview his contact with Scott McDonald. Appellant stated that McDonald was aware of the drug deal between appellant and Buck. He then stated that he only saw McDonald once on Christmas Eve at approximately 1:30 in the afternoon. He denied having any further contact with him on that day. Regarding his whereabouts on Christmas Eve, appellant indicated that he was either at church, or with family or friends until approximately 1:30 a.m. on Christmas morning when he returned home. Although appellant initially denied that McDonald was at his house at around 11:00 p.m. on Christmas Eve, he subsequently remembered that McDonald did stop by briefly. Then, when questioned about Buck's murder, appellant revealed that McDonald had done it. Appellant stated that on December 26, 1999, he met McDonald at a Kroger store after Geach's visit. Appellant stated that although McDonald did not come right out and admit to the killing, he did reveal that Buck's body was in a manhole and that he had dragged his body to the manhole. McDonald had also told appellant that he had burned the clothes that he, McDonald, had been wearing. Finally, appellant revealed to the officers that McDonald told him he shot Buck in the head in Buck's Jeep. He further stated, however, that he did not know the location of the Jeep.
 {¶ 29} The next day, Paul Accettola notified the officers that appellant did in fact know the location of the Jeep and it was then that the Jeep was recovered. The officers then met appellant at Accettola's office for a fourth interview. During that interview, appellant revealed McDonald's plan to set up Buck. Under the plan, appellant and Buck were to make a deal for Buck to buy 100 pounds of marijuana, Buck was to give appellant the bulk of the money and would later meet McDonald to pay the rest of the money and pick up the marijuana. McDonald, however, would not deliver the drugs. Appellant then told the officers that on December 23, 1999, Buck gave him $28,000. On Christmas Eve at about 1:30 in the afternoon, appellant then gave McDonald $23,000 and kept $5,000 for himself. Later that evening, McDonald returned to appellant's home and indicated that Buck was pressing him to make the deal. Appellant told the officers, however, that at that point, he was "out of the loop" and it was up to McDonald to deal with Buck. Later that evening, McDonald called appellant and said he was at a store and needed a ride. When appellant arrived to pick him up, McDonald had blood on his clothes. He then removed his clothes and put them in the trunk of appellant's car. Appellant drove McDonald home, McDonald went into his garage for clean clothes and put the bloodied clothes into garbage bags. When McDonald asked appellant to burn the clothes, appellant refused. McDonald then said he could burn them at Blair's dad's house. Appellant then dropped McDonald off at his car and went to Chris Henneman's house. Appellant told the officers that McDonald told him that Buck "started going crazy on him" and so McDonald shot him in the head. Appellant further admitted, however, that he sold McDonald a Smith Wesson revolver about three weeks before Christmas and that he got the gun from Henneman. Nevertheless, appellant insisted that he did not know McDonald was going to kill Buck. Regarding the $13,000 that he gave to Brad Chester on Christmas Eve, appellant told the officers that he had the money long before that night and that Chester needed it at that time because he had found a location for their pizza shop.
 {¶ 30} Brad Chester testified at the trial below that he owns Bambino's Pizza and that he and appellant work out together at the Power House Gym. Chester stated that in the fall of 1999, appellant indicated that he was interested in investing in a new pizza shop that Chester wanted to open. In early to mid December, 1999 Chester told appellant that he would need the money soon so that he could secure a location for the pizza shop. Then, on Christmas Eve, appellant left a message for Chester indicating that he had the money. Before New Years Eve, appellant brought Chester $13,000 in cash in small bills in a bag. Subsequently, the police contacted Chester and he eventually returned the money to appellant.
 {¶ 31} In addition to the above, several friends and acquaintances of appellant and/or McDonald testified at the trial below. Sharay Vig Hardison, McDonald's girlfriend at the time in question, testified that on December 20 or 21, 1999, McDonald received a burn injury to his face which also burned off his eyebrows and eyelashes. The burns required McDonald to go to the hospital and McDonald told her that he received the burns from a "cocktail bomb." Hardison described the burns as appearing painful, stated that McDonald's skin was peeling off and said that he had to keep his facial skin covered with a salve or special cream. Regarding Christmas Eve 1999, Hardison stated that she left for her stepfather's house at around 8:45 p.m. and that McDonald stated that he was going to go to appellant's house. Hardison arrived home at about 10:30 that evening and paged McDonald. McDonald called her back at around 11:00 and indicated that he would be coming home. When McDonald did not return home, Hardison began paging him, but McDonald did not respond. Hardison paged McDonald approximately 30 times to no avail. McDonald eventually returned home shortly after 1:00 a.m. McDonald subsequently asked Hardison to lie to the police and tell them that he was with her the entire night. Hardison was also questioned about McDonald's green Michigan baseball cap, which she stated had been missing from their house since around October 1999. Hardison insisted that McDonald was not wearing that hat on Christmas Day 1999 but she also admitted that she was not with him that entire day.
 {¶ 32} Steven Massey, whose daughter Blair was a friend of McDonald, testified as to the events of Christmas morning 1999. Massey stated that he keeps a wood burning stove in his garage and that on Christmas morning, McDonald came over to his house with two paper bags in his hands. Massey remembered the event because McDonald was wearing a green Michigan baseball hat and Massey is an Ohio State fan. Massey told him to remove his hat. When McDonald did, Massey noticed that McDonald's hair and eyebrows were missing and his face appeared to be covered with Vaseline. When Massey asked him what happened, McDonald said he was at a bonfire when someone threw a can of spray paint into the fire and it blew up. Regarding the paper bags, McDonald told Massey that he had broken up with his girlfriend and wanted to burn some of her things. Massey then told him he could put the bags into the wood stove. Massey never saw what was in the bags. Massey did, however, identify the baseball cap that McDonald was wearing when shown the baseball cap that the officers recovered from Cincinnati.
 {¶ 33} Christopher Henneman testified as to his recollection of the events surrounding the death of Joshua Buck. Henneman and Buck had been friends since the sixth grade and Henneman knew appellant and McDonald from the neighborhood. They all went to Bowsher High School. Although Henneman and Buck had been close friends, Henneman stated that in 1997, they had a falling out over money. Henneman then began to hang out with appellant. They all used drugs and appellant sold drugs with Henneman working as a runner. Henneman stated that appellant usually got his drugs from a guy named "Sosh" or "Stosh" and that appellant was deeply in debt. Shortly before Christmas 1999, Henneman was at appellant's house when appellant and his wife were laughing about something. Appellant then told Henneman that McDonald had burned his face and he had no eyebrows, but appellant would not tell Henneman how McDonald burned his face. Finally, later that evening, appellant told Henneman that McDonald was looking down a hole and a back draft came up and hit him, burning his face. When Henneman asked why McDonald was looking down a hole, appellant told him that if you preburn a hole before putting a body in it, dogs can't smell the body. Henneman testified that he believed that conversation took place on December 22, 1999. Henneman then stated that on Christmas Eve he went to appellant's house at around 10:45 p.m. After a short time, appellant suggested that they go to Henneman's house to smoke marijuana, which they did. Appellant, however, only stayed at Henneman's house for about ten minutes, and he left at around 11:15 p.m., saying he had to pick up some money. Appellant returned to Henneman's house at around 1:00 a.m. Henneman testified that when appellant came in, he "stared at me weird" and then suggested they smoke marijuana. Appellant left shortly thereafter. Henneman stated that when he returned at 1:00, appellant was wearing the same clothes that he wore earlier and that the clothes did not appear bloodied or damaged. Subsequently, after Buck's body was discovered, appellant sat his wife Michelle and Henneman down, said the police were asking him questions, and said he wanted to make sure their stories were the same. He asked Henneman to tell the police that they were together the whole evening. Henneman also testified that several days before Christmas, he gave appellant a Smith Wesson gun. Thereafter, Henneman lied to the police and stated that he and appellant were together the whole evening. Explaining his reason for lying, Henneman testified that he was afraid because appellant once told him that friends who were disloyal end up in holes like Josh. Toward the end of January 2000, Henneman left town and went to New Mexico. Eventually, however, he called the police and told them the truth.
 {¶ 34} Finally, Leo Martinez, Buck's neighbor, also testified at the trial below. Martinez recalled that on Christmas Eve 1999, at approximately 11:55 p.m., he was letting his dog out when he noticed Buck's car driving away. Martinez testified that although he could not see exactly who was in the car, he could tell that there were three people in the car, two in the front seat and one in the back, and that Buck appeared to be sitting in the front passenger's seat leaning over as if to pick up something. The driver of the car appeared to be larger that Buck.
 {¶ 35} In his defense, appellant called his wife Michelle Beach and prior attorney Paul Accettola as witnesses. Michelle testified that in December 1999, appellant supported them by selling drugs. Michelle recalled the events of Christmas Eve and Christmas Day 1999 and, although her time line varied a bit from other witnesses, she admitted on cross-examination that she did not know where appellant was from 12:30 a.m. to 1:30 a.m. Christmas morning. Accettola testified that after discussions with appellant, he relayed to the police the general location of Buck's Jeep. Accettola further testified regarding his attempts to verify that a telephone call was made to appellant's home late on December 24 or early on December 25 from any of a number of pay phones in the general area from which appellant believed McDonald had called him for a ride. Accettola stated that he collected the numbers and presented them to the Mr. Weglian of the prosecutor's office along with a copy of a court order which Ameritech required to access the information. Accettola testified that when he submitted the information to Weglian, he told Weglian of the time frame within which the order had to be signed and submitted to Ameritech before the information was lost but that Weglian subsequently informed him that the court order had not been timely transmitted.
 {¶ 36} At the conclusion of the trial, the jury returned a verdict of guilty on the charge of aggravated murder in violation of R.C. 2903.01(B). The jury, however, was unable to reach a verdict on the firearm specification. Appellant was subsequently sentenced to life in prison with parole eligibility after 20 years. It is from that conviction and sentence that appellant now appeals.
 {¶ 37} Appellant's first and second assignments of error are related and will be addressed together. Appellant asserts that the trial court erred in permitting his statements to law enforcement officers to be admitted at trial as evidence against him. These statements, appellant contends, were made in the course of negotiating a plea agreement and, therefore, were inadmissible pursuant to Evid.R. 410. Appellant further asserts that if those statements are determined to be admissible then his pre-trial and trial counsel were ineffective in failing to ensure that his constitutional rights were protected prior to permitting him to talk to the police.
 {¶ 38} Evid.R. 410(A) provides in relevant part:
 {¶ 39} "Except as provided in division (B) of this rule, evidence of the following is not admissible in any civil or criminal proceeding against the defendant who made the plea or who was a participant personally or through counsel in the plea discussions:
 {¶ 40} "* * *
 {¶ 41} "(5) Any statement made in the course of plea discussions in which counsel for the prosecuting authority or for the defendant was a participant and that do cnot result in a plea of guilty or that result in a plea of guilty later withdrawn."
 {¶ 42} In State v. Frazier (1995), 73 Ohio St.3d 323, the Supreme Court of Ohio analyzed Evid.R. 410 and determined that "[t]he test whether an accused's statements were made during plea discussions is to be determined on a case-by-case basis in light of all the facts. In determining admissibility of statements made during alleged plea discussions, the trial court must first determine whether, at the time of the statements, the accused had a subjective expectation that a plea was being negotiated. The trial court must then determine whether such an expectation was reasonable under the circumstances." Id. at 337. Upon appellate review, "[t]he admission or exclusion of relevant evidence rests within the sound discretion of the trial court and its decision regarding that evidence cannot be reversed absent an abuse of that discretion." State v. Combs (1991), 62 Ohio St.3d 278,284.
 {¶ 43} Appellant's recorded statements made to Officers Forrester and Smith on January 18 and 24, 2000, are the subject of these assignments of error. No where in either of these statements is there any indication that appellant was induced to make them with the promise of a plea bargain. To the contrary, all indications are that appellant made the statements of his own free will. Moreover, Attorney Accettola testified at the motion hearing that no plea negotiations induced the January 18 or 24 statements and that no specific plea negotiations had been undertaken until January 25, 2000. Rather, Accettola testified that "Everything I did was in the furtherance of putting Mr. Beach in a posture that would render him a proper subject for a plea negotiation." In light of the facts surrounding the January 18 and 24 statements, we cannot say that appellant had a subjective expectation that a plea was being negotiated. As such, the trial court did not abuse its discretion in allowing the statements to be used as evidence in the trial below. The first assignment of error is not well-taken.
 {¶ 44} Appellant next contends that if we find no error in the trial court's admission of his statements, then his trial counsel was ineffective in failing to ensure that his constitutional rights were protected prior to allowing him to speak with the officers.
 {¶ 45} The standard for determining whether a trial attorney was ineffective requires appellant to show: (1) that the trial attorney made errors so egregious that the trial attorney was not functioning as the "counsel" guaranteed appellant under theSixth Amendment, and (2) that the deficient performance prejudiced appellant's defense. Strickland v. Washington (1984),466 U.S. 668, 686-687. In essence, appellant must show that his trial, due to his attorney's ineffectiveness, was so demonstrably unfair that there is a reasonable probability that the result would have been different absent his attorney's deficient performance. Id. at 693.
 {¶ 46} Furthermore, a court must be "highly deferential" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" in reviewing a claim of ineffective assistance of counsel. Id. at 689. A properly licensed attorney in Ohio is presumed to execute his duties in an ethical and competent manner. State v. Hamblin
(1988), 37 Ohio St.3d 153, 155-56. Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel. State v. Phillips (1995),74 Ohio St.3d 72, 85. Even if the wisdom of an approach is debatable, "debatable trial tactics" do not constitute ineffective assistance of counsel. State v. Clayton (1980),62 Ohio St.2d 45, 48-49. Finally, reviewing courts must not use hindsight to second-guess trial strategy, and must keep in mind that different trial counsel will often defend the same case in different manners. Strickland, supra at 689; State v. Keenan
(1998), 81 Ohio St.3d 133, 153.
 {¶ 47} Appellant asserts that his pre-trial and trial counsel were ineffective in failing to insure that the protections afforded by Evid.R. 410 were in place prior to permitting him to speak to the police. Without these statements, appellant asserts, the state would have had a small, if any, chance of gaining a conviction and, as such, he was clearly prejudiced by counsel's deficient performance.
 {¶ 48} Evidently, appellant is suggesting that his trial counsel was ineffective by failing to require appellant to offer to plead guilty to some offense in exchange for his statement. As is clear from Attorney Accettola's testimony at the hearing on the motion to determine the admissibility of appellant's statements, counsel's goal was to remove the cloud of suspicion from appellant by having appellant speak honestly with the officers. The officers already knew that Buck's death was the result of a drug transaction and that appellant was involved in that drug transaction. After the officers interviewed appellant on January 18, Accettola knew that appellant had not been entirely forthcoming in his statement. Moreover, the January 18 statement was the third time appellant had spoken to officers and the third time that he had changed his story. Accordingly, Accettola arranged a fourth interview for January 24 in the hopes that appellant's additional statement would prevent the state from indicting him on murder charges. That statement, however, did not appease the officers. Clearly, Accettola's actions with respect to these interviews fall within the realm of reasonable representation. The successfulness of counsel's strategy depended upon appellant's truthfulness.
 {¶ 49} Accordingly, we cannot say that appellant's trial counsel was ineffective in his dealings with regard to the January 18 and 24, 2000 interviews and the second assignment of error is not well-taken.
 {¶ 50} Appellant's third and fourth assignments of error are related and will be addressed together. Appellant asserts that the trial court erred in permitting the state to argue at the trial that appellant was a complicitor after indicting him as the principal offender and filing a bill of particulars which also named him as the principal offender. Appellant further asserts that by allowing the state to change its theory of the case at the start of the trial, the court in effect amended the indictment and allowed the state to try him on facts which differed from those upon which the grand jury found probable cause.
 {¶ 51} At the trial below, during the jury voir dire, the state revealed that it was proceeding on a theory that appellant may have been a complicitor in the death of Joshua Buck. Appellant moved for a mistrial and the motion was denied.
 {¶ 52} The Supreme Court of Ohio addressed this very issue inState v. Herring (2002), 94 Ohio St.3d 246. In that case, the defendant, Herring, was indicted on three counts of aggravated murder. In the state's second amended bill of particulars, the state specified that Herring was the principal offender in the aggravated murder of one Jimmie Lee Jones. At the trial, however, the state requested, over Herring's objection, an instruction that the jury could convict Herring of the aggravated murder of Jones if it found that Herring was either the principal offender or an aider and abettor. Before the Supreme Court of Ohio, Herring argued that the jury instruction violated hisSixth Amendment right to be informed of the nature and cause of the accusation. He asserted that because the bill of particulars indicated that he was the principal offender, he lacked notice that the trial court would instruct on accomplice liability. The Supreme Court rejected that argument, finding: "R.C. 2923.03(F) states: `A charge of complicity may be stated in terms of this section, or in terms of the principal offense.' Thus, a defendant charged with an offense may be convicted of that offense upon proof that he was complicit in its commission, even though the indictment is `stated * * * in terms of the principal offense' and does not mention complicity. R.C. 2923.03(F) adequately notifies defendants that the jury may be instructed on complicity, even when the charge is drawn in terms of the principal offense. See State v. Keenan (1998),81 Ohio St.3d 133, 151." Id. at 251.
 {¶ 53} With regard to appellant's argument under the fourth assignment of error, Crim.R. 7(D) provides: "The court may at any time before, during, or after a trial amend the indictment, information, complaint, or bill of particulars, in respect to any defect, imperfection, or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged." Given R.C. 2923.03(F) and the Supreme Court of Ohio's holding in Herring, it is clear that any amendment to the indictment that may be presumed by the trial court's permitting the state to proceed on a theory of complicity did not change the name or identity of the crime charged. The third and fourth assignments of error are not well-taken.
 {¶ 54} In his fifth assignment of error, appellant asserts that the jury's determination that he committed aggravated murder but inability to reach a decision on the firearm specification amounted to inconsistent verdicts in violation of his rights to due process and to be free from cruel and unusual punishment.
 {¶ 55} In State v. Davis, 6th Dist. No. L-00-1143, 2002-Ohio-3046 ¶ 24, we specifically rejected this very argument, finding that there is a substantial body of Ohio jurisprudence which holds that when a principal charge in an indictment is not dependent on an attached specification, a conviction on the principal charge, coupled with an acquittal on the specifications, does not invalidate the principal conviction. SeeState v. Perryman (1976), 49 Ohio St.2d 14, paragraph three of the syllabus; State v. Lovejoy (1997), 79 Ohio St.3d 440, at paragraph one of the syllabus; State v. Boyd (1996),110 Ohio App.3d 13, 16-17. Nevertheless, appellant contends that these and similar cases cannot withstand careful scrutiny in light of the United States Supreme Court's decision in Penry v. Johnson
(2001), 532 U.S. 782. In Davis, supra at ¶ 29, however, we expressly rejected this same argument, concluding that nothing inPenry affects Ohio precedents concerning inconsistent verdicts between counts or between counts and specifications. Accordingly, the fifth assignment of error is not well-taken.
 {¶ 56} In his sixth assignment of error, appellant asserts that insofar as any of the errors complained of are deemed not to have been properly preserved by trial counsel, appellant was denied the effective assistance of counsel.
 {¶ 57} App.R. 16(A) provides in relevant part: "The appellant shall include in its brief, under the headings and in the order indicated, all of the following: * * * (3) A statement of the assignments of error presented for review, with reference to the place in the record where each error is reflected. * * * (7) An argument containing the contentions of the appellant with respect to each assignment or error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies." Appellant has not specifically identified any errors or omissions by trial counsel which he claims rise to the level of ineffective assistance of counsel. That reason alone would be sufficient to dispose of this assignment of error. Nevertheless, we note that with regard to the assignments of error addressed thus far, appellant's trial counsel filed proper motions and raised proper objections. As such, appellant has failed to demonstrate that his trial counsel was ineffective in failing to preserve issues for appeal. See Strickland, supra. The sixth assignment of error is not well-taken.
 {¶ 58} In his seventh assignment of error, appellant asserts that improper remarks made by the prosecutor during the rebuttal portion of his closing argument deprived him of his right to a fair trial. As such, he contends that the trial court erred in denying his motion for a mistrial on the grounds of prosecutorial misconduct.
 {¶ 59} A motion for a mistrial is addressed to the sound discretion of the trial court. State v. Glover (1988),35 Ohio St.3d 18, 19. When, however, the motion alleges prosecutorial misconduct, "a reviewing court must undertake a due process analysis to determine whether the conduct of the prosecutor deprived the defendant of his or her due process right to a fair trial." State v. Saunders (1994), 98 Ohio App.3d 355, 358, citing State v. Johnston (1988), 39 Ohio St.3d 48, 60. Generally, conduct of a prosecuting attorney at trial shall not be grounds for reversal unless the conduct deprived the defendant of a fair trial. State v. Apanovitch (1987), 33 Ohio St.3d 19,24. An appellant is entitled to a new trial only when a prosecutor asks improper questions or makes improper remarks and those questions or remarks substantially prejudice appellant.State v. Smith (1984), 14 Ohio St.3d 13, 14. In analyzing whether an appellant was deprived of a fair trial, an appellate court must determine whether, absent the improper questions or remarks, the jury would have found the appellant guilty beyond a reasonable doubt. State v. Maurer (1984), 15 Ohio St.3d 239,267. Moreover, the prosecutor's conduct must be considered in the context of the entire trial. State v. Keenan (1993),66 Ohio St.3d 402, 410. The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. State v. Phillips
(1982), 455 U.S. 209, 291. An accused is guaranteed a fair trial, not a perfect one.
 {¶ 60} Generally, the state may comment freely on "`* * * what the evidence has shown and what reasonable inferences may be drawn therefrom.'" State v. Lott (1990), 51 Ohio St.3d 160,165, quoting State v. Stephens (1970), 24 Ohio St.2d 76, 82. Prosecutors, however, may not invade the realm of the jury by rendering their personal beliefs regarding guilt and credibility, or alluding to matters outside of the record. Smith, supra at 14.
 {¶ 61} Appellant asserts that during his rebuttal closing argument, the prosecutor assumed facts not in evidence and attacked the integrity of appellant's trial counsel. Appellant cites four instances in which the prosecutor assumed facts not in evidence. In three of those instances the trial court sustained appellant's counsel's objections to the statements and in one of those instances the court admonished the jury that the prosecutor's statements were not evidence and that the jurors should rely on their collective memory. Upon review, we cannot say that any of the statements made by the prosecutor substantially prejudiced appellant or deprived him of a fair trial. In the first instance, the prosecutor presumed that Scott McDonald knew the area behind Bowsher High School well because he lived in the neighborhood and "probably hung around, smoked cigarettes, whatever." In the second instance, the prosecutor commented on when appellant spoke to Sharay Hardison. In the third instance, the prosecutor, addressing a remark made by appellant's trial counsel, used the term "phone booth" instead of "pay phone." Finally, the prosecutor commented: "You know they could have planned or there was opportunity for them to have a change of clothes that they were going to be doing this dirty deed." There was no evidence that appellant had a change of clothes on the evening of the murder. Nevertheless, the court overruled the objection and reminded counsel that she had admonished the jurors several times to rely on their collective memory. Finally, appellant challenges the prosecutor's statement regarding appellant's trial counsel's closing argument that "He tells you now — Mr. Wingate — that this is a lie. Everything in here is a lie." The trial court then sustained appellant's counsel's objection. Again, as improper as the comment may have been, we cannot find that it arose to the level of reversible error. That is, we cannot say that absent those remarks, the jury would not have found appellant guilty beyond a reasonable doubt.
 {¶ 62} Accordingly, the seventh assignment of error is not well-taken.
 {¶ 63} In his eighth assignment of error, appellant asserts that the trial court erred in denying his motion for acquittal.
 {¶ 64} Crim.R. 29 provides that if the evidence is insufficient to maintain a conviction, the court shall enter a judgment of acquittal. Sufficiency of the evidence to support a conviction is a question of law. State v. Thompkins (1997),78 Ohio St.3d 380, 386. The standard inquiry into the sufficiency of the evidence "`* * * is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" State v. Smith (1997),80 Ohio St.3d 89, 113, quoting State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus, following Jackson v.Virginia (1979), 443 U.S. 307.
 {¶ 65} After reviewing the record in this case, we find that the above standard has been more than adequately satisfied. Appellant was charged with aggravated murder in violation of R.C.2903.01(B), which reads: "No person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit * * * aggravated robbery [or] robbery[.]" In addition, R.C. 2923.03 provides in relevant part: "(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following: * * * (2) Aid or abet another to commit the offense[.] * * * (F) Whoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender. A charge of complicity may be stated in terms of this section, or in terms of the principal offense." The evidence presented by the state below at a very minimum established that appellant aided and abetted another in the commission of the aggravated murder of Joshua Buck during the commission of robbery. Accordingly, we cannot say that the trial court erred in denying appellant's motion for an acquittal. The eighth assignment of error is not well-taken.
 {¶ 66} Finally, in his ninth assignment of error, appellant asserts that the cumulative effect of the harmless errors committed by the trial court deprived him of the constitutional right to a fair trial. Having found no errors or harmless errors in our review of the previous eight assignments of error, we cannot find that the doctrine of cumulative error applies to this case. The ninth assignment of error is therefore not well-taken.
 {¶ 67} On consideration whereof, the court finds that appellant was not prejudiced or prevented from having a fair trial and the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the court costs of this appeal pursuant to App.R. 24.
Judgment Affirmed.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Knepper, J., Pietrykowski, J., Singer, J., Concur.