DECISION AND JUDGMENT
{¶ 1} This appeal comes to us from a judgment issued by the Lucas County Court of Common Pleas, following a jury verdict finding appellant guilty on four counts of complicity. Because we conclude that the trial court committed no prejudicial error, appellant received a fair trial, and the evidence was sufficient to support the convictions, we affirm. *Page 2 
 {¶ 2} Appellant, Antoine Tuggle, was indicted on four counts: Count 1 complicity in the commission of murder, in violation of R.C. 2903.02(B) and 2929.02; Count 2 — complicity in the offense of involuntary manslaughter, in violation of R.C. 2903.04(A); Count 3 — complicity in the offense of aggravated riot, in violation of R.C. 2917.02(A)(2) and (C); and Count 4 — complicity in the offense of felonious assault, in violation of R.C. 2903.11(A)(2). Attached to each count was also a firearm specification, in violation of R.C. 2941.145 and a "gang" specification, in violation of R.C. 2941.142. The charges stemmed from a shooting incident which occurred in May 2006, and resulted in the death of Jerome Saxton.
 {¶ 3} Appellant pled not guilty, and the court conducted a week-long jury trial, beginning on May 21, 2007. The testimony of approximately 19 witnesses and 40 exhibits were admitted into evidence.
 {¶ 4} The state's first witness, Rico Hester, testified that, although not officially a member himself, some of his friends are members of a street gang known as the "Nine Hundred Boys" ("Nine Hundred") or "South Side Folks." Hester testified that on the night of the shooting, he was working at the Blueprint nightclub ("Blueprint"). When he got off work and left the club around 2:30 a.m., he joined other Nine Hundred members who were gathered across the street. He soon left in a car that joined in with a "parade" of about 20 cars that were traveling to Lincoln Street ("Lincoln"), which was one-way. Hester said that he did not know why the cars were driving to Lincoln, but that he just decided to follow the crowd, becoming the eighth car in line. The street was dark and the *Page 3 
cars had their lights on. He said that after turning, about mid-block on Lincoln, he heard gunshots.
 {¶ 5} Hester said that he knew and was friends with Saxton from junior high age. Although he knew who appellant was from seeing him at the club, Hester said he did not know appellant personally and denied that there had ever been any trouble between them. Hester stated that in May 2006, a verbal argument occurred inside the Blueprint and was then continued outside the club. Hester observed police officers clearing groups of people out of the parking lot.
 {¶ 6} Another witness, Lawrence Glover, a second cousin to the victim, testified that he is a member of the Nine Hundred gang, but that Saxton was not a member of the gang. Glover said that he knew appellant from playing football with him during his grade school years. Glover said that he had never had any fights with and got along with appellant, who is a member of the Hill Side gang. Glover said that appellant and another Nine Hundred member, Donte Gilmer, known as "Juvie," had gotten into a fight the weekend before the shooting. Glover said Juvie sustained serious injuries to his jaw from bricks thrown during the altercation.
 {¶ 7} Glover testified that, on the night of the shooting, he went to the Blueprint Club and talked to appellant. Glover said that sometime prior to the day of the shooting, appellant's little brother, "Jerry or Gerald" allegedly had fought some Nine Hundred boy who jumped him on Belmont, threw bricks at him, and kicked appellant's mother's car. When appellant asked Glover if he had been a part of that, Glover said, "no." Glover said *Page 4 
that he tried to explain to appellant that the group that jumped his brother was actually the "Little Belmont Boys," another south Toledo gang group. Appellant assured Glover that everything was "good" between them.
 {¶ 8} Later, however, tension flared in the parking lot after everyone left the club. Police presence prevented any fighting in the lot. Glover said appellant asked him and other Nine Hundred members what they wanted to do and then asked if they were going to Lincoln, implying that there was to be a fight. According to Glover, appellant called him on his cell phone around 1:30 a.m., and asked if they were coming to meet them on Lincoln. Glover surmised that the purpose was "to fight for the little revenge" for jumping on appellant's little brother. Glover said he told everyone that was at the club about the cell phone conversation, but advised them he was not going to Lincoln. Glover then went to his home on Vance Street.
 {¶ 9} After Glover learned that Saxton had been shot, he had his girlfriend drive him by the scene and viewed the victim in the car. Glover did not talk to police, but went home again and told his family members about the incidents. He stated that he initially refused to testify in court, but was jailed by the prosecutor on the Saturday before the trial. He was released as a result of his cooperation and agreement to testify.
 {¶ 10} On cross-examination, appellant's counsel sought to introduce cell phone records to impeach Glover's testimony that appellant called Glover first, but the court ruled the record inadmissible because it was without proper foundation and authentication. *Page 5 
 {¶ 11} Next, Kim Hyatt, age 17, testified that since he was too young to enter the Blueprint, he would go there to hang out in the parking lot. He stated that he was present during the fight between appellant and Donte Gilmer, "Juvie," that took place prior to the weekend of the shooting. Hyatt said he saw Juvie get hit in the face with a brick, but did not see who actually threw it. Juvie was laying on the pavement, bleeding and severely injured. He also stated that the incident occurred because earlier, one of Hyatt's friends had fought appellant's brother, Jerry, and kicked his mother's car. Hyatt also stated that he did not see the shooting on Lincoln Street.
 {¶ 12} Emir Means, age 22, a cousin to the victim, testified that he was a member of the Nine Hundred gang. He also said that Saxton was not in a gang, but that he hung out with gang members. Means stated that he was with Saxton who was driving his car on the night of the shooting. Means had not been at the Blueprint on the night of the shooting, and did not know what had happened there. He and Saxton had gone to a local gas station and met up with approximately ten cars transporting members of the Nine Hundred gang. Means said that he heard from someone that appellant had called and told the other gang members to come to Lincoln, but that he was not present when that call occurred. Means said he had never personally had a fight with appellant, but knew who he was and could recognize him. After the call came in, the Vance Street cars, containing 50 to 75 people, then drove to Lincoln in a line. Means said he himself was not planning to fight and Saxton was not a fighter. He thought that any people involved, such as appellant, were only going to have a fist fight to settle any gang issues. *Page 6 
 {¶ 13} Means said that, once on Lincoln, the cars began pulling over in front of one particular house, and Saxton's car was blocked in. When the shooting started, Means got out of the car and ducked down between vehicles. He said neither he nor anyone in his car had a firearm. Means said the shots came from the "left side" of the street, or driver's side of the car. He said he had seen and recognized appellant standing outside with "a lot" of other people, as Saxton's car first came down the street. Means did not see appellant with a gun, but said the shots were fired from three or four locations in front of the first three houses on the street where all the people had been standing. Means did not see anyone shooting from the cars.
 {¶ 14} When the car in front left, Means said he got back into Saxton's car and saw that Saxton had his foot on the gas and brake pedals at the same time, causing the tires to squeal. Means at first thought Saxton was purposely "power braking," and tried to shake Saxton, telling him to "go, go!" He then saw all the blood and realized Saxton had been shot in the head. Means then took Saxton's foot off the brake and turned the steering wheel, causing the car to take off around the corner where it hit a pole and stopped. At that point, Means, who was frightened, jumped out of the vehicle and ran. He did not realize that Ernest Reed, who was in the back seat of the car, had been grazed by a bullet across his ear. Means got into another car, was taken to Belmont Street, and then ran to his home. Upon arriving at home, he saw the blood on his clothing and told his mother what had happened. *Page 7 
 {¶ 15} On cross-examination, Means acknowledged that although his mother took him back to the scene that same night and he talked to police, he did not actually remember talking to them. He told police that night that he saw people on the porch at 1433 Lincoln, but did not pay attention to who they were. At that time, he did not say he had seen appellant. Later, when he talked to prosecutors, he told them he had recognized appellant standing in front of the house, but did not see him with a gun or shooting.
 {¶ 16} The next witness, Ernest Reed, aged 21, said he was a good friend of the victim. On the night of the shooting, he was riding in the back seat of Saxton's car, along with Emir Means, who is his "godbrother." Saxton had picked Reed up at the gas station. Reed said that the car entered a "parade" of between 15 to 20 cars and he did not know why they drove to Lincoln Street. After turning onto Lincoln, he heard shots fired and saw Means exit the car. Reed said he ducked down, but a bullet grazed his right ear, requiring 12 stitches. Reed said he heard three different guns in the several shots fired, and then a shotgun blast at the end.
 {¶ 17} Because he was lying down on back seat, Reed said he did not see Saxton get shot. He did see Means get back in the car, take Saxton's foot off the brake, and get the car moving. Reed said Saxton's car hit another car, and then Means jerked the wheel and they hit the pole. At that point, he and Means both got out of car and ran down street because people were still shooting. Reed got into another car that took him to Vance Street where he called his mother to take him to the hospital. Reed said he did not see any of the shooters and did not know anything about a possible fight. He said when *Page 8 
Saxton first pulled onto Lincoln, he saw a porch full of people and someone who was standing on the curb with blue sweatpants and white tee shirt. That person did not have a gun. Reed acknowledged being a Southside gang member, as part of the neighborhood where he lives. He said during the shooting, he could see clearly even though it was dark, but could not identify anyone as a shooter or even the location source of the gunshots. He said that the car and Romie were shot on the driver's side, which was facing the porch where the people were gathered.
 {¶ 18} Another witness, Jonathan March, stated that he was in court that day because the prosecutor had threatened to put him in jail if he did not testify. He stated that he lived on Lincoln Street with his mother and was outside on his porch during the time of the shooting. He denied being a gang member, but said he had been at the Blueprint, had gotten a ride, and was dropped off at home around 3:00 a.m. March said there were between 15 to 20 people on the street and just "chilling on the porch" at 1433 Lincoln.
 {¶ 19} March said he lives at 1424 Lincoln, which is about three houses down from 1433 on the opposite side of the street. He agreed that the street was dark and not well-lit, and that there were trees blocking his vision also. Nevertheless, March said he saw appellant outside the house at 1433, just talking with his friends about the conflict with the South Side. Later, however, he said that even before the cars came down the street he, he saw appellant and three to four people on the porch at 1433 with guns. *Page 9 
 {¶ 20} March said he saw the procession of cars coming down Lincoln, when suddenly, everyone "got to shooting" and "bullets started flying." He said he just saw "people" near the houses shooting and shooting coming from the cars, but could not actually see the shooters. March then sought safety inside his house. March said he did not talk to police that night because he did not want to get in the middle of two gangs. Later, at the request of his uncle, George Mitchell, he later went to the prosecutor to inform him that Mitchell was not at the scene that night.
 {¶ 21} Kevin Smith, Toledo Police Department ("TPD") sergeant, testified that he was on patrol in the area when he was called out to Lincoln on a report of a person being shot. He responded, took control of the situation, notified the TPD detectives and the investigation unit, and secured the witnesses. Earlier that evening, while Sergeant Smith was patrolling in the area, he noticed four to five cars in a single file turning onto Lincoln. While he continued on his way to the club area, he received the "shots fired" call and immediately went back to Lincoln. Sergeant Smith saw Officers Sutherland and Eycke on the scene near a car which had struck a pole. The person in the front seat had been shot. Two other officers, Sergeant Frederick and Sergeant Raab, also were supervising the scene.
 {¶ 22} Sergeant Smith later talked to people living in houses at 1431 and 1433 Lincoln. At the latter address, he found four people and searched the house, but found no weapons. He said that on the night of the shooting, witnesses and local citizens were uncooperative and did not wish to speak with him about what happened. Sergeant Smith *Page 10 
did not hear any shots fired in the time before getting the dispatch. Further, he agreed that, on the night of the shooting, the street area was not well-lit and was very dark.
 {¶ 23} Another TPD officer, Larry Lambert, testified that he was assigned to south Toledo and worked nights at the time of the shooting. He was on one of the assisting crews on the night of the incident, since this was not in his normal patrol area. Officer Lambert arrived after several other crews were already there, and had the car towed. He could not recall if the victim was still in the car when he arrived. After the car was towed, he remained at the scene for perimeter duty of 1431 and 1433 Lincoln. He stated that his log shows that he arrived at 3:16 a.m., the car was towed at 4:15 a.m. He said that police thought there were suspects in one of those houses. Officer Lambert stayed for an hour or so, leaving the scene at dawn, but did not see anyone come out of the rear of either house.
 {¶ 24} TPD negotiator, Anthony Gillen, testified that, at around 5:15 a.m., he was called to coax out the people in the houses at 1431 and 1433 Lincoln. Officer Gillen said that after approximately 30 to 45 minutes, two people came out of 1431 and five people came out from 1433. The five from 1433 were separated, taken downtown for questioning, and were arrested and charged with obstruction of justice. Appellant was not among those arrested that night.
 {¶ 25} Kristi Eycke, also a TPD officer, testified that on the evening of the shooting, she worked the midnight shift, patrolling an inner city area. She stated that she was called between 3:00 and 3:30 a.m., to respond to a "shots fired" report by another *Page 11 
police unit that was en route to the scene. Officer Eycke said that when she arrived at the scene, there was blood inside the car and the victim was slumped forward with an obvious head wound. She said the victim was not breathing, and had no pulse, but then suddenly she heard a gurgling noise, a sharp inhalation sound, and Saxton started breathing. Realizing that the victim was still alive, the fire squad was called which began emergency treatment. Officer Eycke said that witnesses at the scene identified the victim as "Romie." She then accompanied the victim to the hospital, where his ID was removed from his pants, and she learned that the victim's name was Jerome Saxton.
 {¶ 26} Patrick Sutherland, a 12-year veteran TPD officer, said that he worked midnights on the evening of the shooting. He and his partner, Officer Eycke, were at the local gas station monitoring the crowd when another unit called in a "shots fired" report. The two officers responded to the general area where the shots were heard, as directed by the dispatcher. When they arrived, Officer Sutherland saw a car pulling away from the curb and followed it around the corner onto Smead Street. He then saw a maroon Chevrolet automobile off on the right side of Smead against a tree. At first, it appeared to have been involved in a traffic crash. The officer saw two males from the other car get out and look in the driver's side.
 {¶ 27} Officer Sutherland got out of his patrol car and checked the driver who had a serious head injury and appeared to be deceased. As he was approaching the two young men who had stopped, he heard the victim gasp for air and called for an EMT unit. The officer then identified the two males and got contact information for each. Since they *Page 12 
were both very upset, the officer made no attempt to interview them at that time. At trial, Officer Sutherland then identified several photos showing the vehicle and victim at the scene, which were admitted into evidence. He stated that after the victim was removed from the car and taken to the hospital, he remained at the scene to preserve any evidence in the vehicle.
 {¶ 28} While the victim was being removed from the car, a woman approached him, telling him that her son had also been shot and was further down Smead Street. Officer Sutherland then walked to the woman's car and saw a young male that he later identified as Emir Means, who was very emotional and not very responsive to questions. The officer learned, however, that Means had been in Saxton's car. The officer said that Means' incoherent responses were typical of someone who had suffered a traumatic experience. Although Means had blood on his clothing, neither the officer nor a firefighter could find injuries. Means' mother then said she was going to take him to hospital to get rechecked. At this point, the officer had no suspects. Officer Sutherland said he then went back to the car and accompanied it to the forfeiture barn where it was stored and protected.
 {¶ 29} TPD detective, Douglas Allen, testified that he is generally assigned to the "gang unit" and is familiar with members of the Nine Hundred Boys gang. Allen was sent to the scene of the shooting later that morning. He found shotgun wadding and a pellet pattern on the house where the incident took place, indicating that at least one shotgun blast had been fired from the street towards the house. The detective then talked *Page 13 
to several witnesses and knew their gang affiliation. When he later began to gather witnesses for trial, Donte Gilmer ("Juvie") and another witness could not be located. Detective Allen was able to find George Mitchell, Jonathan March, Emir Means, Rico Hester, and Ernest Reed.
 {¶ 30} Allen then noted that, in his experience, gang members are often afraid to tell the truth because it might get them in trouble with their gang. He said they are intimidated and will not talk, even though they could be charged with crimes. Allen denied threatening any of the witnesses, but told them they had an obligation to their dead friend to show up at trial and tell the truth about what happened and what they saw or heard. Allen acknowledged that Jonathan March was told by Detective Kantura that he would be "in trouble" if he did not appear in court and testify pursuant to the issued subpoena. Allen did not consider holding a witness in custody until he agreed to testify to be "intimidation" of a witness.
 {¶ 31} Allen then stated that he did not make the decision, however, to place Ernest Glover in custody, pending his agreement to testify. While Glover was in jail, however, Allen talked with him and told him he had to tell the truth. Allen said that Glover feared that he would be charged if he admitted being a member of the Nine Hundred Boys. Glover eventually told Allen that he had received the phone call from appellant and had told other people about it. He feared that his conversation would be seen as the reason the others all went to Lincoln Street which resulted in the shooting. Glover agreed then to testify regarding his statements made to police officers. *Page 14 
 {¶ 32} The next witness, Brandon Calhoun, age 20, who was also charged in this case, testified. Pursuant to a plea agreement, he had pled guilty to involuntary manslaughter, with a gun specification, and to aggravated riot. He was awaiting sentencing, and agreed to testify at appellant's trial as part of his plea agreement.
 {¶ 33} Calhoun testified that a week or so before the shooting incident, while traveling on Belmont Street, "multiple guys" tried to pull him and appellant's younger brother from their car and had kicked the car. Bad feelings remained with appellant and others because of that incident.
 {¶ 34} Calhoun stated that on the night of the shooting, he had gone to the Blueprint. Even though he was under 21, he went to dance and hang out. Calhoun testified that he was close friends with appellant who was "like a brother." After the bar shut down, Calhoun saw about "50 guys" that he did not recognize accosting appellant. Calhoun said that he stayed in the club while police cleared everyone out from the parking lot. Appellant and he then left in a car driven by a third person, and went to a local gas station to hang out. They did not stop, however, because they saw too many "South Side guys" at the station.
 {¶ 35} Calhoun said they then drove to Lincoln, to appellant's aunt's house. Calhoun said he did not see appellant's brother there that night. Calhoun said he was outside just talking with a group of less than ten friends. He said that, despite being underage, he had been drinking cognac at the club and was very drunk. Calhoun testified that while he was standing outside, a passenger in a car driving by in the street pointed a *Page 15 
shotgun at his back. He said he froze, but then turned to see who it was and identified the person as George Mitchell, also known as "G Mitch." Calhoun denied having previous problems with Mitchell, but knew who he was. Calhoun said while the shotgun was at his back, Mitchell cocked the hammer and tried to shoot, but the gun did not fire.
 {¶ 36} Calhoun said he then went back into appellant's aunt's house, but he saw no one else there and did not know where his friends were. Calhoun said he was worried that Mitchell would return with the shotgun and heard multiple gunshots outside. Calhoun said he asked appellant's aunt for a gun, took it, and then went back out onto the porch. He said he did not know the people in the cars, but came out shooting at them in the street. He said that before he started shooting, he saw a car "power braking" in front of the house and could not see how many people were in it.
 {¶ 37} Calhoun said he then shot at two cars, a "gray `98" and a "burgundy Chevy." He did not know if he hit anyone or how many shots he fired. He also did not actually see the persons firing guns from the cars. He said he did not see anyone else except George with a gun, but he heard six to seven guns shooting. Calhoun said that everyone was "going crazy" when the shooting started, with one car power braking and another leaving, jumping up on the curb. He and appellant then went back into the house, and he laid the gun on the table. Appellant's aunt was still in house when they came in. Calhoun took a bath, but put the same outfit back on and left. Appellant also left, wearing the same clothing he had on during the shooting. Calhoun said he then went out of town to a hotel in Michigan for three to four days. He knew that Saxton had been shot *Page 16 
and ultimately died. Calhoun said it was possible that he shot Saxton, but did not know for sure, and that he had never discussed the shooting with appellant.
 {¶ 38} Calhoun stated that he is a member of the "Macomber" gang, but appellant is not. He said he did not know whether appellant was a member of any gang. He acknowledged that he loves appellant like a brother, however, and was willing to shoot people for him. Calhoun said that the police detectives and prosecutors told him he would get a harsher sentence if he did not say that he saw appellant shooting a gun. Calhoun said, however, that he did not see appellant with a gun or doing anything else.
 {¶ 39} Cynthia Beisser, Lucas County Deputy Coroner, performed an autopsy on Saxton. She stated that the cause of death was a single gunshot wound to the head. She said that the bullet entered from front to back of the head and left a track through the brain. Beisser said that the part of the brain destroyed by the bullet governed speech and possibly consciousness. Saxton's lungs also showed evidence of pneumonia, from being on a long-term respirator. Eventually the wound resulted in necrotic brain tissue, scarring on the victim's skull, and a fracture that did not heal properly. She recovered the lead core and jacket of the bullet.
 {¶ 40} Chad Culpert, a second TPD detective, arrived after the victim was removed, and discovered the following evidence: shell casings and a shotgun wad on the ground in front of the house in the middle of the block. He opined that pellet indents on the house indicated that shooting had come from both the street toward the house as well as from the house toward the street. He also photographed the scene, but he concluded *Page 17 
that there was no "scientific" or physical evidence that could identify who fired the shot that killed Jerome Saxton.
 {¶ 41} David Cogan, a civilian employed by the TPD to test firearms and bullet fragments and projectiles, testified as to the type of bullet and firearms that were used. He said that the bullets that struck Saxton were likely to have been fired from a .038 caliber pistol, but could not testify absolutely, to a degree of scientific certainty, that all other possibilities were excluded. Cogan said, however, that the bullets were most consistent with those fired from a .038 handgun.
 {¶ 42} TPD Officer Michelle Roush testified that she was on duty the night of the shooting. She patrolled the area at the Blueprint to keep order after the bar closed at 2:00 a.m. She observed two groups of three to four individuals who were arguing back and forth. Her attention was drawn to appellant who kept exchanging words with another group and repeatedly ignored her commands to get in his car and leave. Officer Roush stated that, at least once, she saw appellant throwing his arm up and making a motion with his hand, pointing like a gun, which she said appeared as a challenge to fight or a threat to people in the other group. She said that appellant's group appeared to be the agitators.
 {¶ 43} To prevent any escalation, Officer Roush took appellant into custody, handcuffed him, and briefly placed him in her cruiser. She then issued him a ticket for walking along the roadway and released him after most people had dispersed. Officer Roush did not charge him with disorderly conduct or any other more serious offense, *Page 18 
even though his actions may have warranted it. She said she did not want to have to reduce the number of needed officers in the area. She had no further contact with appellant that night.
 {¶ 44} The state then rested. Appellant moved for acquittal pursuant to Crim. R. 29 as to all counts and specifications. The court granted the motion as to the four gang specifications, which were conceded to by the state. However, the court denied appellant's motion as to the remaining offenses.
 {¶ 45} Appellant presented the following two witnesses and testimony in his defense. Brandon Simms, appellant's longtime friend, testified that he lived on Lincoln for 23 years, his entire life. On the evening of the shooting, he was not at the Blueprint or in cars or with any shooters. He was, however, returning home and turned onto Lincoln at the same time as about four other cars were backing up to leave. He said the street was dark because some street lights were never lit.
 {¶ 46} Simms exited his car, and saw, in front of his house, two "dudes" standing under a big tree. As he walked up to the gate, they asked, "Who is that?" He said he responded, "Who is you?" and they said, "Oh, what's up?" They were only an arm's length away, but he said he could not make out their faces because it was too dark. Simms said he did not know the men and did not recognize their voices. Further, he noted that if they knew him, they would not have approached him asking "Who is that?"
 {¶ 47} Simms walked onto his porch, got his keys out, and turned to look at the men because it was late. He was suspicious as to why they were there and why they *Page 19 
seemed to be hiding under the tree. Opening his door, he saw the men crouching down, like they were trying to do something, and one reached back as if to get something. Simms said he hurried into the house, and then suddenly heard a "big old boom," like music from a car, and the car sped off. Simms then looked outside and saw Saxton's car, the "Caprice," hit a pole, followed by police cars coming down the street. Simms said he did not hear any shots and did not see appellant that night. Although he could see the car that crashed, he could not see anyone on the nearby porch because it was too dark.
 {¶ 48} Another witness, Kejuan Stone, testified that he was at the Blueprint on the night of the shootings. He said he was with two of his friends and he saw appellant at the club. Stone said that a large group of young men were outside the club, telling the door personnel to ask appellant to come out of the club. When appellant came outside, Stone saw the police put him in a police car. Stone said he left the club around 2:30 a.m. with one of his friends in another person's car. They then drove to 1433 Lincoln, where one of his friends lived, just to hang out on the street and talk. He said this house was near appellant's aunt's house. Stone said he and "a lot of people," including appellant, were standing, hanging out, in front of the house which was very dark. He stated that he did not know everyone that was there. Since they had been drinking alcoholic beverages, he said there was some loud talking. He then heard someone in the group say, "Who the f — — is that?" referring to more than 15 cars coming down the street.
 {¶ 49} Stone said they all ran toward the porch, and crouched down. After that, the gunshots started and they continued to take cover. According to Stone, appellant was *Page 20 
on the porch at this time. Stone said he did not see anyone, including appellant, with a gun. Stone identified damage to the house, shotgun pellet holes, which occurred that night. He said the gunfire lasted about 20 to 30 seconds and he just tried to protect himself.
 {¶ 50} After the cars left, everyone got up and ran in different directions. Stone ran down the street to appellant's aunt's house, and was not at 1433 Lincoln when the police arrived. He said that he saw Brandon Calhoun at the Blueprint earlier in the evening. Stone did not, however, recall seeing him outside on Lincoln before the shooting, but saw Calhoun at the house afterward. Stone said he had no knowledge that appellant's aunt had provided Calhoun with a gun, and did not see any weapon on the table when he went to her home after the shooting. Stone said that he was shaken by the incident, became physically ill, and went to sleep at appellant's aunt's house. He said he did not call the police to tell them that someone had been shooting at him and his friends.
 {¶ 51} The defense then rested and the state offered no rebuttal witnesses. The jury found appellant guilty on all four counts and the firearm specifications. The court sentenced appellant as follows: Count 1, complicity in the commission of murder — 15 years to life in prison, three years mandatory firearm specification, served consecutively to each other, for a total incarceration of 18 years to life; Count 2, complicity in the offense of involuntary manslaughter — ten years in prison, three years mandatory incarceration as to the firearm specification, to be served consecutively to each other, but concurrently to other sentences imposed; Count 3, complicity in the offense of *Page 21 
aggravated riot — one and one-half years in prison, three years mandatory incarceration as to the firearm specification, to be served consecutively to each other, but concurrently to all other sentences imposed; and Count 4, complicity in the offense of felonious assault eight years in prison, three years mandatory incarceration as to the firearm specification, to be served consecutively to each other, but concurrently to all other sentences imposed.
 {¶ 52} Appellant now appeals from that judgment, arguing the following eight assignments of error:
 {¶ 53} "Assignment of Error No. I:
 {¶ 54} "The court erred and the accused was denied due process and a fair trial when the court allowed the state to amend the charges filed by the Grand Jury, which resulted in impermissibly broadening or expanding the charges made in the indictment.
 {¶ 55} "Assignment of Error No. II:
 {¶ 56} "The court erred, abused its discretion or committed plain error when it allowed the jury to consider (as substantive proof) evidence the admission of which violated the hearsay rule, the defendant's right of confrontation, Rules 404(A) and (B), and the rule against opinion testimony.
 {¶ 57} "Assignment of Error No. III:
 {¶ 58} "The court erred, and the accused's right of confrontation was denied, when the court barred the defense's efforts to effectively cross-examine the state's chief witness, Lawrence Glover, on a most (perhaps the most) critical issue in the case. *Page 22 
 {¶ 59} "Assignment of Error No. IV:
 {¶ 60} "The court abused its discretion, simply erred, or committed plain error when it allowed a police officer to give his opinion as to why various potential witnesses were reluctant to testify, and when he was allowed to testify that various witnesses were fearful of reprisals or had, in fact, been intimidated.
 {¶ 61} "Assignment of Error No. V:
 {¶ 62} "The appellant was deprived of due process and a fair trial in the wake of the fact that his trial counsel's performance was constitutionally deficient, namely his counsel made errors so serious that he was not functioning as the `counsel' those accused in our courts are guaranteed by the Sixth Amendment.
 {¶ 63} "Assignment of Error No. VI:
 {¶ 64} The Court erred, or abused its discretion, when it refused (after being asked) to instruct the jury on self-defense.
 {¶ 65} "Assignment of Error No. VII:
 {¶ 66} "The prosecutors were guilty of misconduct in connection with their elicitation of considerable impermissible evidence and in the wake of certain of the comments made by them during their opening statement and in their summations.
 {¶ 67} "Assignment of Error No. VIII:
 {¶ 68} "Given the verdicts finding the appellant guilty were not supported by substantial and competent evidence sufficient to meet due process standards, it follows *Page 23 
these convictions must be reversed for the lack of sufficient evidence to support the findings of guilt beyond a reasonable doubt."
 I. {¶ 69} In his first assignment of error, appellant contends that his constitutional rights were violated because the indictment did not include a complicity charge. We disagree.
 {¶ 70} R.C. 2923.03(F) states: "A charge of complicity may be stated in terms of this section, or in terms of the principal offense." Therefore, "a defendant charged with an offense may be convicted of that offense upon proof that he was complicit in its commission, even though the indictment is `stated * * * in terms of the principal offense' and does not mention complicity. R.C. 2923.03(F) adequately notifies defendants that the jury may be instructed on complicity, even when the charge is drawn in terms of the principal offense. See State v.Keenan (1998), 81 Ohio St.3d 133, 151 * * *." State v. Herring (2002),94 Ohio St.3d 246, 251.
 {¶ 71} Crim. R. 7(D) provides that the "court may at any time before, during, or after a trial amend the indictment, information, complaint, or bill of particulars, in respect to any defect, imperfection, or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged." Therefore, an amendment to the indictment may be presumed by the trial court's permitting the state to proceed on a theory of complicity, provided it did not change the *Page 24 
name or identity of the crime charged. State v. Beach, 6th Dist. No. L-02-1087, 2004-Ohio-5232, ¶ 53.
 {¶ 72} In the instant case, appellant was put on notice by operation of R.C. 2923.03(F) that the jury could be instructed on complicity, even though he was only charged as the principal. Furthermore, as acknowledged by appellant, the prosecution alleged that appellant committed certain acts "in complicity with Brandon Calhoun and other complicitors * * *." Therefore, since the name or identity of the crimes charged were not changed, any evidence, references, or jury instructions regarding complicity were proper.
 {¶ 73} Accordingly, appellant's first assignment of error is not well-taken.
 II. {¶ 74} In his second assignment of error, appellant claims that the trial court abused its discretion or committed plain error by permitting the admission of certain hearsay or opinion testimony.
 {¶ 75} An appellate court need not consider an error that was not called to the attention of the trial court at a time when such error could have been avoided or corrected by the trial court. State v.Williams (1977), 51 Ohio St.2d 112, 117, overruled on other grounds (1988), 40 Ohio St.3d 226. As a result, such error is waived absent plain error. State v. Moreland (1990), 50 Ohio St.3d 58, 62. Plain error does not exist unless, but for the error, the outcome at trial would clearly have been different. Id. *Page 25 
 {¶ 76} In this case, most of the alleged errors argued by appellant as to the admission of hearsay or opinion testimony were not objected to by counsel. Therefore, we must consider this assignment of error on the basis of plain error.
 {¶ 77} A trial court has broad discretion to determine whether a declaration should be admissible under a hearsay exception. State v.Dever (1992), 64 Ohio St.3d 401, 410. A trial court abuses its discretion when it acts in an unreasonable, arbitrary, or unconscionable manner. State v. Finnerty (1989), 45 Ohio St.3d 104, 107.
 {¶ 78} "`Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid. R. 801(C). Evid. R. 801(D)(1)(b) explains that a prior statement of a witness is not hearsay if:
 {¶ 79} "The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * consistent with declarant's testimony and is offered to rebut an express or implied charge against declarant of recent fabrication or improper influence or motive[.]" See, generally, State v. Tyler (1990),50 Ohio St.3d 24, superseded by state constitutional amendment on other grounds as stated in State v. Smith, 80 Ohio St.3d 89.
 {¶ 80} Appellant first argues that trial counsel failed to object to and the trial court improperly admitted hearsay statements made by witness, Lawrence Glover, regarding appellant's alleged fight with "Juvie," the weekend prior to the night of the shooting. Our review of the record indicates that Glover did not testify as to any hearsay statements. *Page 26 
Rather, he testified as to what he observed or knew had happened. Although Glover was never asked directly if he was actually present during the fight, he stated that he often went to the Blueprint. Further, his description was phrased in terms of active observations of the alleged fight between appellant and Juvie, rather than from statements made by others to him. Moreover, appellant was permitted to cross-examine Glover regarding his testimony, providing ample opportunity to clarify any confusion. Consequently, we conclude that Glover's testimony regarding the fight was not clearly hearsay, and was admissible. Therefore, the trial court committed no error in permitting such testimony.
 {¶ 81} Appellant also argues that the testimony by Detective Allen constituted inappropriate insinuations or "lay opinion" testimony. Evid. R. 701 provides: "If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue." As testimony of a lay witness, Detective Allen's testimony could be admissible under Evid. R. 701.
 {¶ 82} In this case, it was revealed at trial that, for various reasons, some of the witnesses were reluctant to testify. Detective Allen, an officer who investigates crimes and often deals with youth and gang member witnesses, offered his opinions as to why the witnesses would not want to testify, based upon his own observations and perceptions. His testimony added to the understanding of how his investigation was *Page 27 
conducted and presented information that might aid the jury in determining credibility and motivation for some of the witness testimony.
 {¶ 83} In addition, Detective Allen's reference to "Juvie" as a missing witness merely indicated why that person was not being called to testify personally regarding the alleged altercation between him and appellant. The detective's testimony that other witnesses had told him about the alleged altercation was offered, not for the truth of the matter, but to show Detective Allen's reasons for initially investigating appellant and to show a possible motive for why appellant might have been involved in the events on Lincoln Street. Thus, Detective Allen's testimony fell within the criteria for admissibility under Evid. R. 701, and the trial court did not commit prejudicial error.
 {¶ 84} We further note that much of the testimony that appellant now argues was Detective Allen's inadmissible "opinion," was objected to by defense counsel, and was, in fact, sustained by the trial court. References made by Detective Allen that potential witnesses were told by gang members "to stay the hell off the case because "we know where your babies are" and "where your girlfriend is" were stricken and the jury was instructed to disregard the testimony. Therefore, we cannot say that plain error existed in the admission of either Glover's or Detective Allen's testimony.
 {¶ 85} Accordingly, appellant's second assignment of error is not well-taken.
 III. {¶ 86} In his third assignment of error, appellant claims that his constitutional right of confrontation of witnesses was violated when the court barred the defense's efforts to *Page 28 
effectively cross-examine the state's chief witness, Lawrence Glover, regarding the initiation of a cell phone call.
 {¶ 87} We note that, although appellant phrases this assignment of error in terms of his right to confront a witness, the real issue was whether the trial court properly denied counsel's attempt to introduce an unauthenticated cell phone bill to impeach Glover's testimony. We conclude that the trial court's action was proper.
 {¶ 88} The admission or exclusion of evidence rests in the trial court's sound discretion. State v. Sage (1987), 31 Ohio St.3d 173, 180. As we previously noted, an out-of-court statement offered to prove the truth of the matter asserted is hearsay. Evid. R. 801(C). Pursuant to Evid. R. 802, to be admissible the hearsay evidence must come within one of the hearsay exceptions under Evid. R. 803 or 804.
 {¶ 89} Evid. R. 803(6) provides a hearsay exception for regularly recorded business documents. A telephone record or other such document may fall within the Evid. R. 803(6) business record exception. State v.Hirtzinger (1997), 124 Ohio App.3d 40, 49, citing State v. Knox (1984),18 Ohio App.3d 36, 37. In order for a document to be admissible, however, it must satisfy the requirements of authentication. State v.Smith (1989), 63 Ohio App.3d 71, 74. Evid. R. 803(6) provides that records of a regularly conducted activity may be admissible:
 {¶ 90} "A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, *Page 29 
and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term `business' as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit."
 {¶ 91} Thus, the rule requires that a custodian, or other qualified witness, testify as to the regularity and reliability of the business activity involved in the creation of the record.[1] Although the witness providing foundation for admissibility of the record need not have firsthand knowledge of the transaction, he or she must be sufficiently familiar with the operation of the business and with the circumstances of the record's preparation, maintenance, and retrieval.Hirtzinger, supra, citing State v. Vrona (1988), 47 Ohio App.3d 145,148.
 {¶ 92} In this case, trial counsel did, in fact, question Glover about whether he himself placed the initial call to appellant or if appellant had called him. Glover insisted that appellant had placed the cell phone call. The introduction of the cell phone bill to impeach his testimony would have been proper, but without someone from the cell phone company or even another person to provide foundation for the billing document, it remained unauthenticated and was inadmissible. The trial court even noted that if *Page 30 
counsel were to bring in a person from the phone company to authenticate the document, the bill would be admissible. Therefore, we cannot say that the trial court abused its discretion in denying appellant the use of the unauthenticated cell phone bill to cross-examine Glover and impeach his testimony.
 {¶ 93} Accordingly, appellant's third assignment of error is not well-taken.
 IV. {¶ 94} In his fourth assignment of error, appellant claims that the trial court erred in permitting Detective Allen to give his opinion as to why various potential witnesses were reluctant to testify, and that various witnesses were fearful of reprisals or had, in fact, been intimidated.
 {¶ 95} This assignment of error appears to be comprised of the same arguments made in appellant's second assignment of error, regarding opinion testimony by Detective Allen regarding the reluctance of witnesses to testify regarding the shooting. Therefore, based upon the law and rationale set forth in assignment of error two, we conclude that appellant's argument is without merit.
 {¶ 96} Accordingly, appellant's fourth assignment of error is not well-taken.
 V. {¶ 97} In his fifth assignment of error, appellant contends that he was deprived of due process and a fair trial because he did not receive effective assistance of counsel. We disagree. *Page 31 
 {¶ 98} To establish a valid claim for ineffective assistance of counsel, an appellant must demonstrate that: (1) defense counsel's performance was so deficient that he or she was not functioning as the counsel guaranteed by the Sixth Amendment; and (2) defense counsel's errors prejudiced the defendant, depriving him of a trial whose result is reliable. Strickland v. Washington (1984), 466 U.S. 668, 687;State v. Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus.
 {¶ 99} In this case, appellant relies on the errors alleged in his second, third, and fourth assignments of error regarding hearsay and opinion testimony admitted by the trial court. Based upon our disposition of those assignments of error, we conclude that appellant has not established the first prong of the Strickland test. Therefore, appellant has failed to demonstrate that his trial counsel was ineffective.
 {¶ 100} Accordingly, appellant's fifth assignment of error is not well-taken.
 VI. {¶ 101} In his sixth assignment of error, appellant argues that the trial court erred when it denied appellant's request for a jury instruction on self-defense.
 {¶ 102} The accused bears the burden of proving the affirmative defense of self-defense by a preponderance of the evidence. R.C. 2901.05(A); State v. Gillespie, 172 Ohio App.3d 304, 2007-Ohio-3439, ¶ 12, 13; State v. Jackson (1986), 22 Ohio St.3d 281. "To establish self-defense, a defendant must prove (1) that the defendant was not at fault in creating the situation giving rise to the affray, (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only *Page 32 
means of escape from such danger was in the use of such force, and (3) that the defendant did not violate any duty to retreat or avoid the danger." State v. Robbins (1979), 58 Ohio St.2d 74, 79-80. "If a defendant fails to prove any one of these elements, he has failed to demonstrate that he acted in self-defense." Gillespie, supra, ¶ 12, citing to Jackson, supra.
 {¶ 103} "In determining whether a defendant has sufficiently raised an affirmative defense such as self-defense to warrant a jury instruction, the test to be applied is whether the defendant has introduced evidence that, if believed, is sufficient to raise a question in the minds of reasonable persons concerning the existence of the offense. State v.Melchior (1978), 56 Ohio St.2d 15 * * *. Because proof of an affirmative defense creates reasonable doubt of a defendant's guilt, its proof is a bar to criminal liability for the offense charged." Gillespie, supra, ¶ 13.
 {¶ 104} In this case, appellant primarily argues that Brandon Calhoun, in his admission that he fired shots, was acting in his own self-defense and in the defense of others, i.e., appellant, who were allegedly shot at by persons in the cars on the street. Appellant is apparently claiming that, if Calhoun was justified in firing on the cars in the street, then pursuant to this act of "self-defense," appellant could not be found guilty of felony murder or involuntary manslaughter. This argument is flawed.
 {¶ 105} Calhoun testified that he went into the house, grabbed his weapon from his aunt, went back outside the house, and fired his weapon because he was afraid after allegedly being threatened by someone in a car with a shotgun. Calhoun denied, *Page 33 
however, that he acted with the intention of protecting or defending any other persons. Moreover, he did not testify regarding any intent or reason for any actions by appellant. Our review of the record reveals no evidence regarding any actions by the victim against appellant, or that appellant feared for his life or acted in self-defense or in defense of others. Therefore, we conclude that there was insufficient evidence presented at trial to warrant an instruction on self-defense.
 {¶ 106} Accordingly, appellant's sixth assignment of error is not well-taken.
 VII. {¶ 107} In his seventh assignment of error, appellant claims that the prosecutor committed misconduct in comments made during the opening statement and closing argument.
 {¶ 108} "The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." State v.Smith (1984), 14 Ohio St.3d 13, 14. The prosecutor's conduct is not a ground for error unless it deprives the defendant of a fair trial.State v. Maurer (1984), 15 Ohio St.3d 239, 266. A prosecutor is entitled to considerable latitude in opening statement and closing argument, and may comment freely on what the evidence has shown and what reasonable inferences may be drawn from it. State v. Smith (1997),80 Ohio St.3d 89, 111.
 {¶ 109} Nevertheless, it is improper for a prosecutor to express his or her personal opinion as to the credibility of a witness or as to the guilt of the defendant. State *Page 34 v. Thayer (1931), 124 Ohio St. 1, 6. While barred from expressing his or her personal belief, a prosecutor may "suggest that the evidence demonstrates that the defendant is lying." State v. Skipper, 8th Dist. No. 81963, 2003-Ohio-3531, ¶ 45, citing State v. Draughn (1992),76 Ohio App.3d 664, 670.
 {¶ 110} In this case, appellant argues that the prosecutor improperly stated that appellant had "lured" the people in cars to be "ambushed." In addition, appellant claims that the prosecution "misled the jury by creating false impressions of material facts." This, according to appellant, was done "through cleverly framed questions put to various witnesses that created * * * damaging and prejudicial innuendo and insinuations * * *." Appellant, again, also points to the same alleged "hearsay and opinion" testimony by Detective Allen.
 {¶ 111} Once again, our review of the record indicates nothing prejudicial or improper in the prosecution's opening or closing comments. These comments are simply framed in terms of the prosecution's theory of the case, including the inferences that might be drawn from the evidence and testimony presented. The jury was instructed as to the nature of these arguments and was free to determine validity of the testimony and credibility of the witnesses presented. Therefore, we cannot say that any statements made by the prosecution, even if marginally improper, were so prejudicial as to prevent appellant from obtaining a fair trial.
 {¶ 112} Accordingly, appellant's seventh assignment of error is not well-taken. *Page 35 
 VIII. {¶ 113} In his eighth assignment of error, appellant contends that the evidence presented was insufficient to support a guilty verdict on all of his convictions.
 {¶ 114} Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict. State v. Thompkins, 78 Ohio St.3d 380, 386. On review of the sufficiency of the evidence, an appellate court examines the evidence in the light most favorable to the state to determine whether any rational trier of fact could have found that the state proved beyond a reasonable doubt the essential elements of the crime. State v.Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, following Jackson v. Virginia (1979), 443 U.S. 307. See, also, State v.Yarbrough, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 78.
 {¶ 115} Thus, in determining whether a conviction is based on sufficient evidence, an appellate court does not assess whether the evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. See Jenks, supra, at paragraph two of the syllabus; Yarbrough, supra, ¶ 79 (noting that courts do not evaluate witness credibility when reviewing a sufficiency of the evidence claim); State v. Lockhart (Aug. 7, 2001), 10th Dist. No. 00AP-1138. A guilty verdict will not be disturbed on appeal unless reasonable minds could not reach the conclusion reached by the trier-of-fact. Jenks, supra, at 273; State v. Dennis (1997),79 Ohio St.3d 421, 430. *Page 36 
 {¶ 116} We initially note that each conviction was forcomplicity to commit the particular offense charged. R.C. 2923.03, defining complicity, provides, in pertinent part, that:
 {¶ 117} "(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
 {¶ 118} "(1) Solicit or procure another to commit the offense;
 {¶ 119} "(2) Aid or abet another in committing the offense;
 {¶ 120} "(3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code;
 {¶ 121} "(4) Cause an innocent or irresponsible person to commit the offense.
 {¶ 122} "(B) It is no defense to a charge under this section that no person with whom the accused was in complicity has been convicted as a principal offender.
 {¶ 123} "* * *
 {¶ 124} "(F) Whoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender. A charge of complicity may be stated in terms of this section, or in terms of the principal offense."
 {¶ 125} With this overall framework in mind, we will now examine each of appellant's convictions to determine whether the evidence was sufficient to support the jury's verdicts. *Page 37 
 A. Count 1: Complicity to Commit Murder {¶ 126} R.C. 2903.02(B) states that:
 {¶ 127} "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code."
 {¶ 128} Felonious assault, a second degree felony, is defined by R.C. 2903.11(A)(2), which states:
 {¶ 129} "(A) No person shall knowingly * * *:
 {¶ 130} "(2) Cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."
 {¶ 131} Finally, R.C. 2901.22, defines the culpable mental states in Ohio and provides that:
 {¶ 132} "(B) A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." (Emphasis added.)
 {¶ 133} Therefore, felony murder as defined in R.C. 2903.02(B), with the underlying offense of violence being felonious assault, is supported where the evidence presented "establishes that the defendantknowingly caused physical harm to the victim." State v. Miller,96 Ohio St.3d 384, 2002-Ohio-4931, at the syllabus. *Page 38 
 {¶ 134} Ohio law is further well-settled that, to convict an offender of complicity, the state need not establish the principal's identity. Rather, R.C. 2923.03(C) only requires that the state prove that a principal committed the offense. State v. Perryman (1976),49 Ohio St.2d 14, paragraph four of the syllabus, vacated on other grounds (1978),438 U.S. 911.
 {¶ 135} In the case presented, Calhoun testified that he shot his firearm and that it was possible that his shot could have been the one that hit Saxton. Other witness testimony indicated that appellant was also seen shooting a firearm at cars on Lincoln. Therefore, a reasonable inference can be made either that shots from appellant's weapon directly caused Saxton's death, or that he was, at the least, conspiring with others, including Brandon Calhoun, in conduct which resulted in the shooting and subsequent death of Jerome Saxton.
 {¶ 136} The state was not required to identify a principal as long as it was able to establish that appellant acted in complicity with the person who fired the gun at Saxton and his vehicle. Regardless of their purpose, appellant and Calhoun were presumed to be aware that the conduct of firing weapons at occupied vehicles would likely cause serious injuries to or even kill someone. Consequently, although circumstantial, the testimony and evidence presented and inferences drawn from it supported the jury's finding that appellant acted knowingly and in concert with others. Therefore, the verdict was supported by sufficient evidence on all elements of the crime of complicity to commit felony murder. *Page 39 
 B. Count 2: Complicity to Commit InvoluntaryManslaughter {¶ 137} R.C. 2903.04(A), dealing with involuntary manslaughter, states: "No person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony." Involuntary manslaughter under R.C. 2903.04(A) is a lesser included offense of murder. See State v. Lynch, 98 Ohio St.3d 514,2003-Ohio-2284, ¶ 79.
 {¶ 138} Based upon our discussion of Count 1, felony murder, we conclude that there was sufficient evidence presented as to all the elements of involuntary manslaughter. We further note that, although not assigned as error, for purposes of sentencing, the court should have merged the complicity to commit felony murder conviction and complicity to commit involuntary manslaughter conviction. Nevertheless, the court's sentences for each conviction run concurrent to each other, in effect, creating a merger of the two convictions. Therefore, we conclude appellant's argument as to the conviction for involuntary manslaughter is without merit.
 C. Count 3: Complicity to Commit Aggravated Riot {¶ 139} R.C. 2917.02, aggravated riot, states that:
 {¶ 140} "(A) No person shall participate with four or more others in a course of disorderly conduct in violation of section 2917.11 of the Revised Code:
 {¶ 141} "(1) With purpose to commit or facilitate the commission of a felony;
 {¶ 142} "(2) With purpose to commit or facilitate the commission of any offense of violence; *Page 40 
 {¶ 143} "(3) When the offender or any participant to the knowledge of the offender has on or about the offender's or participant's person or under the offender's or participant's control, uses, or intends to use a deadly weapon or dangerous ordnance, as defined in section 2923.11 of the Revised Code. * * *"
 {¶ 144} R.C. 2917.11, disorderly conduct, provides that:
 {¶ 145} "(A) No person shall recklessly cause inconvenience, annoyance, or alarm to another by doing any of the following:
 {¶ 146} "(1) Engaging in fighting, in threatening harm to persons or property, or in violent or turbulent behavior;
 {¶ 147} "(2) Making unreasonable noise or an offensively coarse utterance, gesture, or display or communicating unwarranted and grossly abusive language to any person;
 {¶ 148} "(3) Insulting, taunting, or challenging another, under circumstances in which that conduct is likely to provoke a violent response;
 {¶ 149} "(4) Hindering or preventing the movement of persons on a public street, road, highway, or right-of-way, or to, from, within, or upon public or private property, so as to interfere with the rights of others, and by any act that serves no lawful and reasonable purpose of the offender;
 {¶ 150} "(5) Creating a condition that is physically offensive to persons or that presents a risk of physical harm to persons or property, by any act that serves no lawful and reasonable purpose of the offender. *Page 41 
 {¶ 151} "(B) No person, while voluntarily intoxicated, shall do either of the following:
 {¶ 152} "(1) In a public place or in the presence of two or more persons, engage in conduct likely to be offensive or to cause inconvenience, annoyance, or alarm to persons of ordinary sensibilities, which conduct the offender, if the offender were not intoxicated, should know is likely to have that effect on others;
 {¶ 153} "(2) Engage in conduct or create a condition that presents a risk of physical harm to the offender or another, or to the property of another."
 {¶ 154} In this case, the court specifically noted that testimony was presented that appellant had allegedly engaged in fighting, challenging others to fight, and in violent behavior by shooting at vehicles — all actions which would cause inconvenience, annoyance, alarm, or risk of physical harm to others or their property. According to witness testimony, these actions allegedly took place while appellant was with at least two other persons and that he allegedly acted with or contacted others to meet and fight with other gang or neighborhood group members on Lincoln Street. Therefore, we conclude that sufficient evidence was presented as to all the elements of complicity to commit aggravated riot.
 D. Count 4: Complicity to Commit Felonious Assault {¶ 155} R.C. 2903.11(A)(2) states: "No person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance, as defined in section 2923.11 of the Revised Code." *Page 42 
 {¶ 156} Appellant was convicted of felonious assault, premised on a theory of complicity. As we noted previously, a charge of complicity may be stated in terms of the principal offense. R.C. 2923.03(F). Therefore, to prove an offender committed complicity to commit felonious assault, the evidence must show that he acted to aid or abet or conspired with another to knowingly cause physical harm to the victim or knowingly cause physical harm to the victim by means of a deadly weapon or dangerous ordnance. R.C. 2903.11(A)(1) and (2).
 {¶ 157} Again, as discussed previously, testimony was presented that appellant was allegedly among the shooters who fired on the cars on Lincoln Street. Thus, at the very least, the evidence demonstrated that he conspired with others to cause harm by means of a deadly weapon. Therefore, we conclude that appellant's conviction for complicity to commit felonious assault was supported by sufficient evidence.
 E. Firearm Specifications {¶ 158} R.C. 2941.145 provides, in pertinent part, that an offender may be charged in the indictment or information with a firearm specification which carries a three-year mandatory prison term indictment "that the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense. * * *" To support a conviction for a firearm specification, the state must prove beyond a reasonable doubt that the firearm was *Page 43 
operable or could readily have been rendered operable at the time of the offense. R.C. 2941.145 and 2923.11(B)(1); State v. Murphy (1990),49 Ohio St.3d 206, 208.
 {¶ 159} In this case, witness testimony indicated that appellant was allegedly standing outside the house with a firearm which he openly fired at vehicles on the street. No evidence was presented that his firearm was inoperable. Therefore, the convictions for the firearm specifications were supported by sufficient evidence.
 {¶ 160} Therefore, we conclude that sufficient evidence was presented to support appellant's four convictions and firearm specifications. Accordingly, appellant's eighth assignment of error is not well-taken. All pending motions are deemed moot.
 {¶ 161} The judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App. R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App. R. 27. See, also, 6th Dist. Loc. App. R. 4. *Page 44 
Peter M. Handwork, J., William J. Skow, J., Thomas J. Osowik, J., CONCUR.
[1] Evid. R. 901(B)(10) is inapplicable to the case at bar. 29. *Page 1